# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| Fernando Gamboa Howard,<br>　　Petitioner<br>v.<br>Rex W. Tillerson, et al.,<br>　　Respondents | 2:17-cv-01977-JAD-GWF<br>**Order Denying Petition for Writ of Habeas Corpus** |

Counseled petitioner Fernando Gamboa Howard petitions for a writ of habeas corpus under 28 U.S.C. § 2241 and challenges his extradition to the United Mexican States (Mexico) by the United States of America (United States) on a charge of aggravated homicide.[1] Gamboa Howard names the U.S. Secretary of State, the U.S. Attorney General, and the U.S. Marshal for the District of Nevada as respondents, and he asserts two grounds for relief: (1) the extradition request does not comply with the treaty's warrant requirement because it is based on an invalid and vacated warrant and the request could not be supplemented with a new warrant that had been issued during the extradition proceeding; and (2) no competent evidence of probable cause supports the certification order.[2] Respondents dispute the merits of both grounds, and they argue that I should disregard the first one because it exceeds the narrow scope of habeas review.[3] Respondents also argue, in a footnote, that I should dismiss the Attorney General and Secretary of State from this case because they are not proper respondents.[4]

---

[1] The extradition court—Magistrate Judge Nancy J. Koppe—entered her order for certification of extradition on July 3, 2017. *In the Matter of Extradition of Fernando Gamboa Howard*, Case No. 2:15-mj-00627, ECF No. 94 (D. Nev. July 3, 2017) (15-mj-627).

[2] ECF No. 1 at 13–19.

[3] *See generally* ECF No. 12.

[4] *Id.* at 11 n.8.

I find that part of Gamboa Howard's first ground for relief falls within the scope of habeas review, but I conclude that the magistrate judge did not err when she found that the warrant requirement was met. As to the second ground, I find that the magistrate judge erred when she failed to consider the allegations of coercion and decide if their reliability can be determined without exceeding the scope of her review. But I conclude that, even without the allegedly coerced witnesses' statements, there is sufficient competent evidence to support the magistrate judge's probable-cause determination. So, I deny Gamboa Howard's petition for a writ of habeas corpus. Finally, I deny the footnoted motion to dismiss the Secretary of State and Attorney General because they have not persuaded me that they are not proper respondents.

## Discussion

**A. Extradition proceedings**

"Extradition law is based on a combination of treaty law, federal statutes, and judicial doctrines dating back to the late nineteenth century."[5] "Authority over the extradition process is shared between the executive and judicial branches."[6] "The process begins when the foreign state seeking extradition makes a request directly to the U.S. Department of State."[7] "If the State Department determines that the request falls within the governing extradition treaty, a U.S. Attorney files a complaint in federal district court indicating an intent to extradite and seeking a provisional warrant for the person sought."[8] "Once the warrant is issued, the district court, which may include a magistrate judge, conducts a hearing to determine whether there is evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or, in other words, whether there is probable cause."[9]

---

[5] *Santos v. Thomas*, 830 F.3d at 987, 990 (9th Cir. 2016) (en banc).

[6] *Id.* at 991.

[7] *Id.*

[8] *Id.*

[9] *Id.* (quotation marks and quoted references omitted).

**B.     Scope and standard for reviewing an extradition order**

A magistrate judge's order certifying extradition "can only be challenged via a writ of habeas corpus, because the order is not final and there is no other statutory provision for direct appeal of an extradition order."[10] When reviewing an extradition order, the district court reviews the magistrate judge's "legal rulings de novo, and its findings of fact for clear error."[11] A "magistrate's probable cause finding is . . . not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," so "it must be upheld if there is any competent evidence in the record to support it."[12] A "district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought"; (2) "the treaty was in force and the accused's alleged offense fell within the treaty's terms"; and (3) "there is any competent evidence supporting [the magistrate's] probable cause determination."[13]

**C.     First ground for relief: satisfaction of the warrant requirement**[14]

When a request for extradition "relates to a person who has not yet been convicted," the Mexico-U.S. treaty requires, among other things, that "[a] certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party" accompany the extradition request.[15] The magistrate judge found that this requirement was met because "a valid warrant for Gamboa Howard's arrest existed at all times" during the extradition proceeding.[16] Gamboa

---

[10] *Id.* at 993.

[11] *Id.* at 1001.

[12] *Id.* (quotation marks and quoted references omitted).

[13] *Id.* (quotation marks and quoted reference omitted).

[14] Unless otherwise noted, the facts mentioned in this order are not in dispute.

[15] Extradition Treaty Between the United States of American and the United Mexican States, Mexico-U.S., art. 10, § 3(a), May 4, 1978, 31 U.S.T. 5059.

[16] ECF No. 1-1 at 11.

Howard contends that this finding is clearly erroneous, arguing that the warrant that Mexico supplied had been nullified, and Mexico could not supplement its request with a new warrant that had been issued during the extradition proceeding.[17] The respondents disagree, and they argue that I should not reach this issue because it exceeds the narrow scope of habeas review.[18]

Issues that are subject to collateral habeas review in extradition matters are limited. As the Supreme Court explained in *Fernandez v. Phillips*, "habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty[,] and . . . whether there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty."[19] The parties agree that there is no binding authority that directly addresses whether Gamboa Howard's warrant challenge falls within the scope of habeas review. There are, however, two Second Circuit cases that are instructive on this issue—*Sacirbey v. Guccione*[20] and *Skaftouros v. United States*.[21]

*Sacirbey* concerns an appeal by a naturalized U.S. citizen who petitioned for a writ of habeas corpus and challenged his extradition to the Republic of Bosnia and Herzegovinia (Bosnia) on the ground that he had not been charged with an extraditable offense under the Bosnia-U.S. treaty.[22] The Second Circuit noted that, "[o]n Sacirbey's reading of the record, the evidence shows that an investigative warrant for his arrest was issued in 2001, but the issuing court was subsequently dissolved, with the consequence that no court in Bosnia is *currently* seized of the matter."[23] The court explained that, similar to the treaty at issue here, the Bosnia-

---

[17] ECF No. 1 at 13–15.

[18] ECF No. 12 at 12–20.

[19] *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

[20] *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009).

[21] *Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011).

[22] *See generally Sacirbey*, 589 F.3d 52.

[23] *Id.* at 63 (quotation marks and quoted reference omitted).

4

U.S. treaty "requires the requesting government to provide a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued. . . ."[24] It went on to interpret the treaty as requiring a "formal legal instrument" "to show that a person has been charged with an extraditable crime."[25] But, the court found, this necessary showing had not been made because Bosnia sought the extradition of Sacirbey under an international arrest warrant that had been issued by the Cantonal Court in Sarajevo; a court that "currently lacks jurisdiction over the investigation of Sacirbey's alleged crimes and no longer has any power to enforce the arrest warrant."[26] And, the court continued, "[t]he arrest warrant for Sacirbey was never re-issued—or otherwise ratified—by a Bosnian court with jurisdiction over this case."[27] Thus, the Second Circuit found that the defect that Sacirbey raised "f[ell] within the narrow category of issues that is cognizable on habeas review of an extradition order,"[28] and it reversed the district court's decision denying Sacirbey's habeas petition, concluding that he "ha[d] not been 'charged' with an extraditable offense pursuant to the terms of the extradition treaty between the United States and Bosnia."[29]

*Skaftouros* concerns an appeal by a Greek citizen who petitioned for a writ of habeas corpus and challenged his extradition to Greece on the ground that he had not been charged with an extraditable offense under the Greece-U.S. treaty because the warrant for his arrest in Greece

---

[24] *Id.* at 57 (quotation marks and quoted reference omitted).

[25] *Id.* at 66.

[26] *Id.* at 67 (quotation marks and quoted reference omitted). The Second Circuit explained that the issuing court had been ousted of jurisdiction, "owing to a constitutional reorganization" or "regime change . . . ." *Id.* at 67, 69.

[27] *Id.* at 67.

[28] The court explained that the warrant issue that Sacirbey raised focuses on the second part of the *Fernandez* court's scope of habeas review: "whether the offense charged is extraditable under the relevant treaty." *Id.* at 66 (quotation marks and quoted reference omitted).

[29] *Id.* at 69.

5

was invalid as it was not signed by the Clerk of that court.[30] The Second Circuit explained that, similar to the treaty at issue here, the Greece-U.S. treaty requires in cases where a fugitive is "merely charged with [a] crime, a duly authenticated copy of the warrant of the arrest in the country where the crime was committed" to accompany the extradition request.[31] Relying on the *Sacirbey* decision, Skaftouros argued that "the Greek arrest warrant was 'fatally defective'" and necessitated granting his habeas petition.[32] The Second Circuit disagreed, explaining that, "[u]nlike the arrest warrant in *Sacirbey*, which failed to show that the fugitive was currently charged and prosecutable, the arrest warrant provided by Greece in this case satisfies these requirements."[33] It noted that "[t]he defects that Skaftouros identifies—namely, that the warrant does not contain the signature of the Clerk or a sufficiently detailed description of his face—are technical in nature, not jurisdictional as in *Sacirbey*."[34] And that "Skaftouros is, of course, free to raise these technical objections before the courts of Greece, which, we are confident, will be more competent to address them than an American court."[35]

The rule that can be distilled from *Sacirbey* and *Skaftouros* is that challenges to a warrant that raise jurisdictional issues fall within the narrow scope of habeas review, but challenges that raise issues of misapplication of foreign law do not. I find these cases persuasive, and I adopt the Second Circuit's reasoning. Applying this reasoning to the facts in this case, I find that part of Gamboa Howard's first ground for relief—that Mexico could not supplement its extradition request with a new arrest warrant that had been issued during the extradition proceeding—falls within the narrow scope of habeas review because it rests on a failure to follow the treaty's

---

[30] *See generally Skaftouros*, 667 F.3d 144.

[31] *Id.* at 159 (quotation marks and quoted reference omitted).

[32] *Id.* at 152.

[33] *Id.* at 160.

[34] *Id.*

[35] *Id.*

6

requirements, not on a failure to follow Mexican law. But, to the extent that Gamboa Howard asks me to decide the effect of the Mexican-court proceedings regarding the first warrant—a reapprehension warrant issued in 2001—that challenge falls outside of the narrow scope of habeas review because it raises misapplication-of-foreign-law issues.

Turning to the merits of the issue that I can consider on habeas review, I note that Gamboa Howard's argument is similar to what was argued *Sacirbey*, but that our facts are materially dissimilar. First, there is no evidence that the Mexican court that issued the first warrant lost jurisdiction over Gamboa Howard's case. The parties agree that a Mexican *amparo* court, which handles habeas-type matters,[36] issued an order regarding the first warrant on December 16, 2015, but they dispute the effect that the *amparo* court's order had.[37] Gamboa Howard's reading of the record is that the *amparo* court's order "vacated" the 2001 warrant, and that there was no warrant for his arrest until nearly one year later when the original Mexican criminal-trial court issued a new one.[38] Respondents' take is that the Mexican criminal-trial court "'complied with the *amparo* decision' and simultaneously 'dismissed the [first warrant and] . . . issued a new arrest warrant [*i.e.*, the 2016 warrant].'"[39] I cannot resolve this question of Mexican law because it falls outside the narrow scope of habeas review. But I don't need to resolve this dispute to determine if the magistrate judge's finding was clearly erroneous because, unlike in *Sacirbey*, a new arrest warrant was issued during the extradition proceeding. Indeed, the parties do not dispute that, during the extradition proceeding: (1) a new arrest warrant was issued by the Mexican criminal-trial court; (2) Mexico provided the new warrant to the Untied

---

[36] *See United States v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir. 1994) (explaining that, "Although the *amparo* is a highly complex legal institution, . . . it is somewhat similar to *habeas corpus* and, *inter alia*, is the means to review and annul unconstitutional judicial decisions.").

[37] *Compare* ECF No. 1 at 5 *with* ECF No. 12 at 7–9.

[38] ECF No. 1 at 5–6.

[39] ECF No. 12 at 8 (quoting 15-mj-627, ECF No. 67-1 at 22–23 (English translation of 12/12/16 correspondence from Embassy of Mexico to the U.S. Department of State explaining what occurred in the Mexican courts)).

7

States to supplement its extradition request; (3) the U.S. Attorney filed the new warrant in the extradition case; and (4) the magistrate judge considered the new warrant when she entered her order for certification of extradition. Gamboa Howard points to no portion of the Mexico-U.S. treaty or binding authority that precludes Mexico from supplementing its extradition request or the magistrate judge from considering such a supplement in deciding whether adequate grounds exist to extradite a fugitive. Nor does he argue that the Mexican court that issued the second warrant lacked jurisdiction to do so. I therefore conclude that Gamboa Howard has not demonstrated that the magistrate judge erred in concluding that the warrant requirement was met.

**D. Second ground for relief: probable cause**

Gamboa Howard contends that the extradition certification order is not supported by competent evidence of probable cause.[40] He argues that the magistrate judge erred when she found that she could not consider a document that he provided during the post-extradition-hearing phase because it required her to "'weigh conflicting evidence and make factual determinations,' which [she] may not do."[41] Gamboa Howard urges that the magistrate judge's finding was erroneous because the document contains allegations of coercion and is, thus, admissible *explanatory* evidence, not inadmissible *contradictory* evidence, as explained by the Ninth Circuit in *Santos v. Thomas*.[42] He says that the magistrate judge should have considered the allegations of coercion. Once she had, she should have rejected the government's witnesses' statements that were allegedly coerced and found that the remaining evidence was insufficient to support a finding of probable cause against him.

The document that Gamboa Howard provided purports to be an undated letter sent by Hector Islas Morales (Morales), his co-defendant in the Mexican criminal proceeding, to the

---

[40] ECF No. 1 at 16–19.

[41] ECF No. 1-1 at 15–16 (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986)).

[42] *Santos v. Thomas*, 830 F.3d 987 (9th Cir. 2016) (en banc).

Constitutional Governor of the State of Baja California.[43] The letter itself is a side-by-side of a letter written in Spanish, which bears an illegible "received" stamp, and an English translation to the right of it.[44] Gamboa Howard's counsel stated in a brief to the magistrate judge that the letter was provided to him in that form by Gamboa Howard's sister after the extradition hearing,[45] but he does not know who prepared the English translation.[46] Counsel states that he obtained an English translation of the Spanish side of the letter from the Federal Public Defender's translator, which was also provided.[47]

The letter appears to recount the events leading up to and after the death of Louis Mario Sanchez Vega (Vega)—the victim at issue in Gamboa Howard's charge of aggravated homicide.[48] The letter states that Jose Carlos Alvarez Grimaldo (Grimaldo), Jose Angel Martinez Gonzalez, and Fidel Juarez Benitez (Benitez) "were isolated, beaten and forced to confess on threat of death."[49] It later states that "[t]wo of them were concealed four or five days. They were beaten and starved. After a week, they were taken before a judge and on October 18 case 288/00 was established for the disappearance and death of an elderly man."[50] "Eight months later[,]" the letter continues, "one of the two already incarcerated was thrown in a 'tomb' of punishment, in the state penitentiary, with the goal of forcing him to confess to having taken part in the crimes and to obtain fictitious assignment against the undersigned and . . . Gamboa Howard as the

---

[43] 15-mj-627, ECF No. 93 at 18–24. The letter purports that it was copied to the "Government General Secretary[,]" "Senior President of Superior Justice Court[,]" "Honorable Counsel of the Judiciary[,]" and "Attorney General."

[44] *Id.* at 18–21.

[45] 15-mj-627, ECF No. 92 at 21.

[46] *Id.* at 21 n.5.

[47] *Id.* at 21; 15-mj-627, ECF No. 93 at 22–24.

[48] 15-mj-627, ECF No. 93 at 22–24.

[49] *Id.* at 22.

[50] *Id.* at 23.

masterminds . . . ."[51] The letter further states that "[t]he ex-employees were coerced for that in order to involve us in very serious facts. As a matter of fact, they retracted before the judge reporting the torture."[52] In sum, this letter is evidence that Benitez's and Grimaldo's statements, on which the United States relied, were coerced.

The Ninth Circuit explained in *Santos v. Thomas* that, "[g]iven the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply."[53] "Instead, 18 U.S.C. § 3190 provides that evidence may be admitted so long as [it] is authenticated and would 'be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped.'"[54] But the accused "does not have the right to introduce evidence in defense because that would require the government seeking his extradition 'to go into a full trial on the merits in a foreign country.'"[55] "Evidence that may be admitted is evidence that 'explain[s] matters referred to by the witness for the government,' while 'evidence in defense' that merely 'contradict[s] the testimony for the prosecution' may be excluded."[56]

Courts have struggled with the question of whether evidence of coercion is explanatory or contradictory. The Ninth Circuit resolved the issue in *Santos* in 2016, concluding "that evidence that a statement was obtained under torture or other coercion constitutes 'explanatory' evidence generally admissible in an extradition proceeding."[57] The *Santos* court explained that the proper

---

[51] *Id.* at 23 (all-caps emphasis omitted).

[52] *Id.* at 24.

[53] *Santos*, 830 F.3d at 991.

[54] *Id.*

[55] *Id.* at 992 (quoting *Collins v. Loisel*, 259 U.S. 309, 316 (1922)).

[56] *Id.* (internal citations omitted) (brackets in the original) (quoting *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)).

[57] *Id.* at 1005.

10

procedure when an extradition court is presented with allegations of coercion is for that court to consider the allegations and decide if their reliability can be determined without exceeding the scope of its review.[58] If the extradition court "cannot determine the credibility of the allegations (or other evidence) [of coercion] once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition."[59]

The extradition court here did not consider the allegations of coercion that are contained in the letter and decide if their reliability could be determined without exceeding the scope of her review, but instead found the letter to be "'conflicting evidence'" that she court not consider in the first instance.[60] This was legal error. But this error does not merit habeas relief.

As *Santos* instructs, the next step in this inquiry on habeas review is to consider whether, assuming Benitez's and Grimaldo's statements should be excluded, there remains sufficient evidence to support a probable-cause finding against Gamboa Howard. Gamboa Howard argues that there isn't because "[t]here are no other eye witnesses" or "physical evidence implicating" Gamboa Howard or even "an identified body."[61] But even if this true, it is a distinction without a difference because "a probable cause determination can be supported entirely by circumstantial evidence."[62] And, as the magistrate judge explained, an extradition court's probable-cause

---

[58] *Id.* at 1006 (citing *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005)).

[59] *Id.* at 1007 (citing 18 U.S.C. § 3184).

[60] ECF No. 1-1 at 15–16 (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986)). The United States interprets the magistrate judge's words to mean that she considered the allegations of coercion and decided that she could not determine their credibility (i.e., that she followed *Santos*'s instruction). But I cannot agree because the magistrate judge clearly states that she "cannot consider" the letter because it requires her to weigh "conflicting evidence . . . ."

[61] ECF No. 1 at 18.

[62] *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007).

11

findings "are based almost entirely on affidavits, depositions, and other documentary evidence supplied by the requesting government."[63]

In support of its extradition request, the United States provided the sworn affidavit of the Mexican prosecutor, Itzel Garcia Galindo, and the exhibits attached to his affidavit include: (1) the factual complaint by the victim's son dated September 9, 2000; (2) four separate reports of the Ministerial Police of the State of Baja California written on separate dates in September and October 2000; (3) the ministerial statement of the victim's son dated October 14, 2000; and a forensic report dated October 17, 2000.[64] The Mexican Ambassador to the United States certified that all of these documents are "properly and duly authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of [the] United Mexican States as required by Title 18, United States Code, Section 3190."[65] That certificate is all the "proof" that is needed for these documents to be "received and admitted as evidence" in an extradition hearing.[66]

The magistrate judge correctly points out that the Ninth Circuit has held that the types of documents that the United States provided can constitute competent evidence to support a certificate of extradition.[67] The Ninth Circuit explained in *Then v. Melendez* that "hearsay evidence is admissible to support a probable cause determination in an extradition hearing, and the usual rules of evidence are not applicable in this context . . . ."[68] It stated that a properly certified and authenticated summary of evidence prepared by the prosecutor may be considered

---

[63] ECF No. 1-1 at 13 (citing 18 U.S.C. § 3190).

[64] 15-mj-627, ECF No. 35-1 at 4–240.

[65] 15-mj-627, ECF No. 35-1 at 2.

[66] *See* 18 U.S.C. § 1390.

[67] ECF No. 1-1 at 13 (collecting cases).

[68] *Then v. Melendez*, 92 F.3d 851, 855 (9th Cir. 1996) (internal citations omitted).

12

as evidence even over the defendant's allegation that it is unreliable.[69] It found that unsworn hearsay statements that are contained in properly authenticated documents can also constitute competent evidence supporting a probable-cause determination.[70] And it has found that police reports that summarize witnesses' statements can be properly considered in deciding probable cause in an extradition case.[71] Gamboa Howard does not address any of these authorities, nor does he argue that any of the evidence that the United States provided—other than the allegedly coerced witness statements—cannot be used to support a probable-cause determination. So, I will consider all of the other evidence that the United States provided in deciding whether there is any competent evidence supporting the magistrate judge's probable-cause determination.

I begin with the factual complaint that the victim's son, Cuauhtemoc Sanchez Gomez (Gomez), made to the Office of the Attorney General for the State of Baja California, on September 9, 2000.[72] The complaint states that Gomez "swore to tell the truth under the terms of the law and after knowing the penalties [that] people receive when they make false statements . . . ."[73] Gomez states that his father, Vega, told him on September 8, 2009, that Vega had just met with his lawyer because he was being threatened with death by his next-door neighbors, Gamboa Howard and Morales, who wanted to dispossess Vega of his property and had prevented him from using his right-of-way easement to access his own property by installing a door and a wire fence.[74] Vega said that he intended to appear as a witness in another person's dispossession case

---

[69] *Man-Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008).

[70] *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986).

[71] *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984), *superseded by statute on other grounds as stated in Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009 n.5 (9th Cir. 2000).

[72] 15-mj-627, ECF No. 35-1 at 70–72. The complaint states that Gomez signed it at the margin for the record, and it is affixed with the seal for the Attorney General's office. *Id.* at 72.

[73] *Id.* at 70.

[74] 15-mj-627, ECF No. 35-1 at 70 (Gomez's factual complaint).

against Gamboa Howard and Morales.[75] Vega then told Gomez that he was going to take a bus to return to his property.[76] Gomez said that he was informed the next day that his father never arrived at his property.[77] He says that authorities began searching for Vega at places where he had been or was believed to have been.[78] Gomez also states that Gamboa Howard and Morales hired several people to guard their property, and that some of them also threatened Vega's life.[79]

Next are the four reports by the Ministerial Police. The first report is dated September 18, 2000, recites that it is the report of officers Joaquin Rodriguez Torres (Torres) and Rafel Vargas Urena (Urena), is signed by both officers, and bears seals for the Attorney General's office and the First Instance Court for civil and criminal matters in Rosarito, Baja California.[80] The officers state in this report that, upon receiving Gomez's complaint, they went to Vega's property and interviewed his neighbor, Santiago Esquivel Zaragoza, who stated that he witnessed Morales and Gamboa Howard threatening Vega.[81] A taxi driver confirmed to the officers that he had dropped Vega off near his property on around 1:30 p.m. on September 8, 2000.[82] The watchman of a hospital near Vega's property confirmed to the officers that he had seen Vega walking on the road near his property close to the second signpost for the hospital at about 2 p.m. that day.[83]

---

[75] *Id.* at 71.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.* at 72–73.

[80] *Id.* at 74, 77.

[81] *Id.* at 75.

[82] *Id.*

[83] *Id.*

In a later report by these same officers, and officers Arturo Torres Flores (Flores) and Luis A. Verdugo (Verdugo), they state that they interviewed a farm worker who said that he ran into Vega near the second signpost for the hospital at around 1 p.m. on September 8, 2000.[84] The officers state in the first report that one of Vega's daughters confirmed that she was at her father's property on the day of his disappearance until the next morning and she never saw him.[85] The officers concluded that Vega had disappeared somewhere between the second signpost for the hospital and his own property. The officers report that the land off of that 1 km stretch of road is owned by Gamboa Howard.[86] One of the security officers working at a booth on Gamboa Howard's property told the officers that he saw Vega walking from the direction of his own property at 6:30 p.m. on the date that he disappeared.[87] The officers opine that this witness is lying based on the other witnesses' statements.[88]

In a report dated October 17, 2000, the four officers state that they interviewed an attorney who claims to have first spoken with Vega on August 29, 2000, and Vega told the attorney that he was afraid to give a witness statement against Gamboa Howard because Gamboa Howard had threatened to kill him if he did.[89] The officers also report that they interviewed Benitez's common-law wife, who stated that she was in the second security booth on Gamboa Howard's property on the day of Vega's disappearance and saw Vega pass by that booth around

---

[84] *Id.* at 82. This report is dated October 17, 2000, is signed by the four officers, and bears the seal of the Attorney General's office and "[h]alf a seal of the Office of the Attorney General of the Republic"). *See id.* at 82, 95.

[85] *Id.* at 75–76.

[86] *Id.* at 76.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 83. Like the others, this report is signed by the officers and bears seals from the Attorney General of Baja California and the Attorney General of Mexico. *See id.* at 95.

15

1 p.m. that day.[90] Shortly after Vega passed her booth, she saw two of Gamboa Howard's security guards pass by in a grey vehicle going in the same direction of Vega.[91] She said that the vehicle returned 10 minutes later (the employees were now in different positions in the vehicle), and made its way to the highway, and then one employee exited the grey vehicle and entered Gamboa Howard's black truck.[92] Next, the black truck and grey vehicle went back down the same road as Vega and returned to Gamboa Howard's ranch some time later.[93]

The officers next report that they accompanied Gamboa Howard, staff from the prosecutor's office, staff from the expert service office of the Attorney General of Baja California, and a forensic unit to the location on the road where they suspected Gamboa Howard disappeared.[94] Just off the road they discovered a "black stain" and inside of it what appeared to be bone fragments, ashes, and personal articles.[95] The officers report that Vega's wife was later brought in to identify the articles that had been collected from the site, and she identified all of them as belonging to Vega.[96] They also report that Gomez identified all of the articles as belonging to Vega, too.[97]

The provided forensic report dated October 17, 2000, states that, on the same date, the Forensic Medical Service analyzed and photographed fragments of what appeared to be bones

---

[90] *Id.* at 91.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 92.

[95] *Id.*

[96] *Id.* at 93.

[97] *Id.* at 94.

that were discovered at the site on October 13, 2000.[98] The bones "showed great damage and destruction caused by direct exposure to fire."[99] Upon visual analysis, the medical experts found that the fragments "present characteristics and similarities of anatomical features of human bones."[100] The Mexican prosecutor describes and summarizes all of this evidence in his affidavit.[101] Based on this record, I conclude that there is sufficient competent evidence supporting the magistrate judge's probable-cause determination without considering Benitez's statement, the report of the proceeding where he identified Gamboa Howard from a photographic lineup, and Grimaldo's statement.

### E. Proper respondents

The parties spar in footnotes about whether the Secretary of State and the Attorney General are the proper parties to respond to Gamboa Howard's habeas petition.[102] Respondents waive any objection to the U.S. Marshal being named as a respondent.[103] Respondents rely on the Supreme Court's decision in *Rumsfeld v. Padilla*[104] to argue that, generally, there is only one proper respondent to a habeas petition—typically the person who has the ability to produce the petitioner's presence before the court rather than a remote, supervisory official. But *Padilla* did not establish an inflexible rule that the immediate custodian of the petitioner is the sole proper respondent for all habeas petitions that can be brought under 28 U.S.C. § 2241. The *Padilla* court, in fact, continued to reserve the question of whether the Attorney General is a proper

---

[98] *Id.* at 108.

[99] *Id.*

[100] *Id.*

[101] *Id.* at 11–16.

[102] ECF No. 12 at 11 n. 8; ECF No. 13 at 2 n.2.

[103] ECF No. 12 at 11 n.8.

[104] *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

respondent to a habeas petition filed by an alien who has been detained pending deportation and is challenging his removal from the United States.[105]

The Court noted that the Ninth Circuit is in the minority of courts that have held that the Attorney General is a proper respondent in those circumstances.[106] The Ninth Circuit decision that *Padilla* mentions, however, has since been withdrawn upon a grant of rehearing *en banc*, and the appeal was eventually dropped by the fugitive without the *en banc* court addressing this issue.[107] So, there is no binding authority on this issue. I note that, unlike in *Padilla*, this petition involves possible executive action that goes beyond merely detaining Gamboa Howard in physical custody within this district. For these reasons, I am not persuaded that the Secretary of State and the Attorney General are not proper respondents. I therefore deny their footnoted motion to dismiss.

## Conclusion

Accordingly, IT IS HEREBY ORDERED that Fernando Gamboa Howard's petition for writ of habeas corpus is **DENIED**.

DATED: February 26, 2018.

_____
U.S. District Judge Jennifer A. Dorsey

---

[105] *Id.* at 435 n.8; *accord Aherns v. Clark*, 335 U.S. 188, 189 (1948) (reserving same question).

[106] *Padilla*, 542 U.S. at 435 n.8 (citing *Armentero v. INS*, 340 F.3d 1058 (9th Cir. 2003)).

[107] *Armentero v. INS*, 340 F.3d 1058 (9th Cir. 2003), *opinion withdrawn on grant of en banc rehearing*, 382 F.3d 1153 (9th Cir. 2004), *appeal dismissed per fugitive settlement doctrine*, 412 F.3d 1088 (9th Cir. 2005).